## THE EDWIN J. BERWIND.

(Circuit Court of Appeals, Second Circuit. March 2, 1906.)

### No. 117.

COLLISION—TUG AND FERRYBOAT CROSSING—FAILURE TO OBSERVE PASSING AGREEMENT.

A tug passing up North river in the daytime near the New York piers *held* solely in fault for a collision with a ferryboat crossing from Hoboken to her New York slip, on evidence that the rule which made the ferryboat the burdened vessel had been superseded by an agreement by signal, initiated by the tug, by which she was to pass under the ferryboat's stern, and which justified the latter in keeping her course and speed.

Appeal from the District Court of the United States for the Southern District of New York.

On appeal by both parties from a decree of the District Court of the Southern District of New York finding the libelant's ferry-boat Hamburg and the steam tug Berwind jointly liable for the damage to the ferry-boat occasioned by a collision between them on the 11th of September, 1903, opposite the foot of Barclay street, North river. The decree awarded the libelant half its damages and costs, amounting to $4,785.97. No opinion was written in the District Court.

Henry D. Hotchkiss, for libelant-appellant.

La Roy S. Gove, for claimant-appellant.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

COXE, Circuit Judge. At noon on the 11th day of September, 1903, the steam ferry-boat Hamburg left her slip at Hoboken bound for her slip at the foot of Barclay street, between piers No. 15 and No. 16, New York. She is a double decked boat about 220 feet in length, over all. There was very little tide, it being the last of the flood.

The Berwind is about 115 feet long, steers by steam, is easily handled, has a horse power of about 800 or 900 and, when crowded, is capable of making between eleven and twelve miles an hour. On the day in question the Berwind backed out of the slip below pier No. 10, North river, at about the same time that the Hamburg left Hoboken. The Berwind was intending to go to Jersey City after skirting the piers for vessels. She expected to pick up a tow at the American line pier, or between piers No. 13 and No. 14, or No. 14 and No. 15. At the time of the collision a mud scow was being towed down the river on the New York side. It is not possible to determine with accuracy the distance of the scow from the piers further than to say that at the moment of collision the Hamburg had passed under the stern of the scow and that the Berwind was, and at all times prior to the collision had been, between the course of the mud scow and her tug and the New York piers.

The Hamburg was in charge of her usual complement of officers and men; the Berwind, on the contrary, was inadequately manned; her master and engineer were below at dinner, the cook was acting as lookout, an unlicensed oiler was in charge of the engine and an unlicensed deck hand was at the wheel. The Hamburg proceeded on her course for the ferry slip, quartering slightly, and had passed under the stern of the mud scow when it became apparent that a collision with the Berwind was inevitable. The Hamburg then ported and reversed so as to throw her stern away and ease the blow as much as possible.

The bow of the Berwind struck the Hamburg a little aft of amidships on the starboard side, causing the damage in question. Assuming that the Berwind was proceeding at moderate speed 350 feet or more from the pier head line and that the Hamburg was near the middle of the river when they first sighted each other, the Hamburg having the Berwind on her starboard hand would have been the burdened vessel but for the fact the rule was superseded by an agreement between the parties that the Berwind should go under the Hamburg's stern. The Berwind contends that no such agreement was made but we are convinced that her contention in this regard cannot be sustained. The master of the Hamburg testifies that when he was about to pass under the stern of the scow heading for his slip and when the Berwind was between piers No. 13 and No. 14, coming up the river "hooked up" she blew him two blasts of her whistle and he answered with two. That these signals were given is admitted. McSweeney, who was acting pilot of the Berwind testifies that he saw

the Hamburg when he was below pier No. 13, and when the Hamburg was four or five piers above her slip and that he then blew two whistles. He says, however, that he blew these whistles to an Erie tug which was backing out of a slip north of pier 14, with a barge lashed to her side, the stern of the tug projecting at the time only about 20 feet from the end of the slip. He testifies further that the tug immediately answered with two blasts and that the ferry-boat blew no signals at all. The tug was afterwards identified as the Buffalo but no one from her was called to corroborate this testimony and in view of the fact that the master of the Ivins, which was towing the mud scow, had already signaled the Buffalo with one blast it would seem a superfluous action on the part of the Berwind to signal a second time. In other words when the Buffalo answered the signal from the Ivins it was evident that she understood the situation and danger from her was averted if, indeed, the situation were such that she could at any time have backed across the course of the Berwind. The master of the Hamburg, corroborated by three of her crew and a passenger, testifies positively that he answered the Berwind's signal by two blasts. The clear weight of testimony, therefore, is that the signals were exchanged as the libelant contends. It is argued that if this agreement were made the Berwind would not have attempted to cross the Hamburg's bow. The answer is that if the agreement were not made the Hamburg would not have attempted to cross the Berwind's bow. The master of the Hamburg was an experienced navigator who thoroughly understood his business. The navigator of the Berwind, on the other hand, was an unlicensed deck hand, and we think it more probable that he misconceived the import of the signals than one who had been crossing the river between Hoboken and New York for nine years and who had an experience of fifteen years as pilot.

If the starboard hand rule had been superseded by a private convention suggested by the Berwind and assented to by the Hamburg no fault can be imputed to the latter in keeping on her course to her slip. She had agreed to do this and the Berwind had agreed to go under her stern. She knew that the ferry-boat was destined for the New York slip and under the agreement it was her duty to slow down and permit the ferry-boat to cross her bow. Her fault in this respect was the sole cause of the collision.

The decree is reversed and the cause is remanded to the District Court with instructions to decree in conformity with this opinion.